FERNÁNDEZ, PLAINTIFF AND APPELLEE, *v.* CASALDUC, DEFENDANT AND APPELLANT.

APPEAL from the District Court of San Juan in an Action for Divorce.

No. 2290.—Decided July 9, 1921.

DIVORCE—CRUEL TREATMENT.—In an action for divorce by the wife on the ground of cruel treatment she need not present a case of violence and mental suffering as strong as the husband would have to present if he were the plaintiff.

ID.—ID.—RECONCILIATION—CORROBORATION.—Even supposing that there may have been a reconciliation, thereafter one of the spouses may bring an action for divorce on the ground of cruel treatment by subsequent acts and set up in corroboration the acts committed prior to the supposed reconciliation.

ID.—ID.—INCOMPATIBILITY.—Although mere incompatibility of temperament is not of itself a ground for divorce, in deciding whether the facts show cruelty the intelligence, apparent education and sentiments of the offended spouse should always be taken into account.

The facts are stated in the opinion.

*Messrs. C. Iriarte, Jr.,* and *F. H. Dexter* for the appellee.

*Messrs. C. Coll Cuchí* and *G. Cruzado Silva* for the appellant.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

The defendant appeals from a decree of divorce and at various stages of the argument contained in his brief, but without separate assignment of errors, suggests that:

"The District Court of San Juan, Section First, erred in overruling the demurrer interposed by the defendant to the complaint on the ground that there was no cause of action.

"The District Court of San Juan, Section First, erred in overruling the motion for nonsuit made by the defendant after the plaintiff rested, on the following ground: Because considering as a whole the evidence introduced at the trial by the plaintiff, it is not sufficient to show a *prima facie* case.

"The District Court of San Juan, First Section, committed a grave error in overruling the motion for a continuance made by the defendant to give time to witness Alberto Bruci to testify and in not allowing defendant's counsel to testify in order to show the reasons why the continuance was asked for, the reason being that the defendant had been surprised by the testimony of the said witness and the said witness having led the defendant to believe that he would testify as to direct statements made by Francisca Látimer in Arecibo about the end of the year 1916, the day before Carmen Fernández left for San Juan, to the effect that she asked said witness Bruci for advice as to what right she had to take her daughter and the children of Carmen Fernández to San Juan without the consent and permission of defendant Casalduc; inasmuch as in spite of the allegation made by the defendant as to surprise and notwithstanding the motion for a continuance on that ground to the effect of showing that fact by means of sworn statements, the court overruled the said motion for a continuance, thus depriving the defendant of the opportunity to explain the statements made by Bruci to counsel for the defendant and thus depriving him of his right as a defendant to defend himself from a surprise during the trial."

The first assignment is based upon section 171 of the Civil Code, which says that "an action for divorce shall be lost upon the reconciliation of the parties." But the section immediately following provides that:

"In case of reconciliation the plaintiff can not continue exercising the rights which he may have, but is at liberty to file a new suit for causes that have occurred after the reconciliation, and in such case may allege the former causes to corroborate the new action."

The cases of *Figueroa* v. *Pierluisi*, 25 P. R. R. 460; *Fernández* v. *Hernández*, 2 S. P. R. 332; *Quiñones* v. *Rodríguez*, 9 P. R. R. 291, and various textbooks are quoted at considerable length as indicating what amounts to extreme cruelty.

In each of the cases last above mentioned the husband was plaintiff and the cruel treatment in question was alleged to have been inflicted by the wife. And, as pointed out in the more recent case of *Dueño* v. *Dueño*, 28 P. R. R. 920, not only may condoned cruelty be revived by fresh acts of cruelty, and not only may such subsequent misconduct be of slighter nature than that which would constitute original cruelty, but also both condonation and revival are less readily presumed against the wife than against the husband. Similarly, the decided cases, without dissent in so far as the question has been discussed, seem to have established as a general rule that a husband who seeks a divorce on the ground of cruelty "must present a plainer case of violence or mental suffering injuriously affecting his health than the wife." 19 C. J. 144, section 367, and cases cited.

In the instant case the wife, or plaintiff, alleged:

"II. That the plaintiff contracted marriage with the defendant in the city of San Juan on June 22, 1910, by the Roman Catholic Apostolic Ritual.

"III. Plaintiff avers that while married to the defendant they had three children named Víctor Alberto, born on April 12, 1911, Laura Hilda, on May 23, 1912, and Alfredo, on July 31, 1913.

"IV. The plaintiff alleges that she lived peacefully with the defendant in the city of San Juan until the year 1912, when the conduct and attitude of the defendant towards her entirely changed to the extent that defendant, instead of treating the plaintiff with the consideration and affection which a husband owes to his wife,

his conduct commenced to be so cruel and unjustified that their marital life became unbearable, thus destroying the plaintiff's happiness, and to such an extent was the sufferings of the plaintiff that she became seriously ill, the defendant having thus destroyed the lawful ends of matrimony.

"V. After the plaintiff had married the defendant they lived in Arecibo until the year 1916, when they moved to San Juan. As soon as their second child was born in the year 1912 the defendant, without any apparent reason, did not speak to the plaintiff for the period of a month, thus causing her great suffering.

"VI. That on a certain occasion and on the marriage of Bárbara, the plaintiff's sister, the plaintiff expressed to her husband her desire to attend the wedding, but he was entirely opposed to it. After many requests from the plaintiff's sister, who had gone to Arecibo with the purpose that the plaintiff should come to the wedding in San Juan, the defendant permitted it, but showing his unwillingness and bad disposition after having consented to it. Upon the return of the plaintiff to Arecibo the defendant received her coldly and for a period of several weeks did not speak a word to her.

"VII. In the month of April, 1915, the defendant opened a letter addressed to the plaintiff by her sister Bárbara, without her knowledge or authorization, and due to that letter the defendant did not speak to her for two months. During that time of disagreement and silence the defendant was regularly absent from home and came back to the house at 10 or 11 o'clock. During that time the defendant asked the plaintiff to cook his meals and while he was at the table did not speak to the plaintiff, entirely ignoring her and showing no consideration for her. These things were done by him publicly and in the presence of the neighbors and servants.

"VIII. The plaintiff alleges that in the year 1915 the plaintiff and the defendant came to San Juan for the purpose of signing certain documents in connection with the testamentary proceedings of the plaintiff's deceased father, who had left her and her brothers some property. While these documents were under legal process the defendant had a discussion with Alfonso, a brother of the plaintiff, about a trivial matter and the defendant, on account of this insignificant thing, ordered the plaintiff that from that very moment she should quit all relations with her brother Alfonso and his wife.

"IX. In the month of March, 1915, Jorge, a brother of the plaintiff, was seriously ill. On the day before his death, the plain-

tiff having been notified of the condition of her brother by her family in San Juan, asked her husband for permission to come to San Juan and visit her brother, which permission was denied by the defendant, and only due to the intervention of the defendant's sister he finally gave permission to his wife so that she should come to San Juan in company with the aforesaid sister of the defendant. The plaintiff arrived after her brother had died and could only be present at the funeral.

"X. Upon the return of the plaintiff to Arecibo with her husband's sister, Alfonso, a brother of the plaintiff, accompanied them in his automobile to the residence of an uncle of the plaintiff, Pedro Fernández, near the town of Bayamón. Upon the arrival of the plaintiff at Arecibo the defendant received her with indifference and for a period of two or three months did not speak to her. Some time later the defendant stated to the plaintiff that this was due to her having allowed her brother to accompany her to the house of her uncle.

"XI. In the month of May, 1916, the plaintiff received a letter from her sister Blanca wherein the latter informed her of the idea of visiting the plaintiff. As soon as the defendant became aware of this letter he positively forbade the plaintiff to receive any visit from her relatives and also told her to write to her sister not to come to Arecibo. At this time the plaintiff's health was very poor and inasmuch as the conduct of her husband was causing her great physical and mental sufferings, she required the company and consolation of her relatives. For this reason her sister Blanca intended to visit her. The plaintiff did not forbid her sister to come and visit her as she had announced and shortly afterwards the said sister arrived in Arecibo. On the next morning after her arrival the defendant packed his valises, stating that he was about to make a trip, but without showing what his intentions were. Upon the arrival of the defendant in Utuado he sent a telegram to Blanca, the plaintiff's sister, informing her that she should go to her home, but as the plaintiff was in very delicate health, her sister did not wish to leave her under such circumstances and remained until the next week when the defendant arrived at Arecibo. Upon coming into the house he created great scandal by throwing down pieces of furniture and making a loud noise, all of which caused great physical and mental suffering to the plaintiff and as a result thereof she became seriously ill.

"XII. The mother of the plaintiff, Francisca Látimer, widow of Fernández, having learned of the serious conditions of her daughter's health, went to Arecibo in order to attend her. Upon the arrival of the plaintiff's mother the defendant showed his disgust and began preparations to leave the house. The defendant did not salute the mother of the plaintiff, nor did he speak to the plaintiff. On the next day the defendant entered the room of the plaintiff by violently pushing the door, and said: 'Inasmuch as you have more interest in your family than in me and the children, I allow you to go back to San Juan with your mother.' The plaintiff thought that the defendant had decided to terminate the marital relations and to send her to her family. This caused the plaintiff a nervous attack which compelled her to be confined to her bed for several weeks under the care of her mother. During this time the defendant did not speak to the plaintiff, nor did he ask about her condition.

"XIII. The condition of the plaintiff was such that her mother thought it necessary to take her to San Juan where she could be under the care and consolation of her family and attended by physicians, since the defendant never desired to call a physician for the plaintiff, considering that it was unnecessary. When the defendant saw that the plaintiff's trunk was already packed to go to San Juan he sent a typewritten paper to the plaintiff to prepare herself to go immediately with him to Utuado. To this command the plaintiff answered by letter, which was dictated by the defendant's father, wherein she said that it was absolutely necessary for her to go to San Juan for a short time for the purpose of recuperating her health and to rest. The conduct and ill treatment of the defendant aggravated the condition of the plaintiff to such an extent that she became so ill that she was about to die. In view of the opinion of Dr. Susoni, who was called to attend the plaintiff whom he found very ill, the defendant finally consented to her going to San Juan. The plaintiff was in San Juan at her mother's house for about two years, during which time the defendant did not furnish her what was necessary for her care and support.

"XIV. In the month of October, 1917, the defendant came to San Juan and lived with the plaintiff's family until August, 1918, and during that time the defendant did not pay anything to the plaintiff's family for his room and board and that of the plaintiff, and for the expenses for medicines and physician required during the illness of the plaintiff; but the said expenses were paid by the plaintiff herself with her own money.

"XV. In the month of October, 1918, when the Island suffered from earthquakes, the plaintiff visited the church accompanied by her children to console herself. As soon as the defendant became aware of this he wrote a letter to the plaintiff forbidding her to take her children to the church whatever might be the religion she professed, as he was opposed to all religions. During the next year the defendant at several times refused to speak to the plaintiff without any motive whatever therefor and wrote letters to her which caused her great bodily and mental sufferings.

"XVI. In the month of September, 1919, the plaintiff suffered from a fall which caused her a bruise on one of her legs. This produced a tumor and caused her great suffering which required the attendance of a physician, but the defendant refused to call a doctor. Finally the defendant, seeing the condition of his wife, called a doctor who stated that she should be taken immediately to a hospital and be operated on. On the 28th of September, 1919, the plaintiff was taken to Miramar Hospital where she was operated on, but the defendant did not take any care of her and refused to accompany her. He did not ask about her condition, nor did he try to see her while she was at the hospital, and has refused to pay her expenses incurred therein. All this was paid by the plaintiff with her own money.

"XVII. After the plaintiff had returned to her home, on a certain occasion she sent her children to the Borinquen Park, accompanied by one of her relatives. When the defendant knew of this he forbade the plaintiff to send the children with any member of her family to any place.

"XVIII. On October 15, 1919, the defendant, without any reason therefor, used rough and threatening language toward the plaintiff and cruelly treated her by violently holding her by her arms after which he threw her aside, plaintiff being at that time, as she is now, in very delicate health and very weak."

Conceding for the sake of argument, without holding, that the fourteenth averment implies a condonation of all the acts charged in the preceding paragraphs, yet, in the light of the rules and definitions above mentioned, we are unable to say that the conduct complained of in the fifteenth, sixteenth, seventeenth and eighteenth averments is inadequate to revive

the previous incidents which appellant insists appear from the face of the complaint to have been condoned. And aside from the question of condonation, it is not, nor can it be, seriously urged that the complaint wholly fails to state a cause of action.

The second assignment is equally without merit. Not only are the facts alleged in the complaint fully proved, but in some instances the evidence in its wealth of detail goes beyond the averment, disclosing aggravating circumstances that lend additional strength to the conservative statement contained in the pleading. A single instance will suffice to illustrate this point. From the testimony of plaintiff in regard to the incident mentioned in the seventh averment, *supra,* we quote the following extract:

"Did anything happen between you and your husband due to a letter written by your sister Bárbara in the month of April, 1915?— Yes sir.

"What happened?—One of my sisters wrote me a letter and my husband, without my permission, opened the letter and read it, and due to this he did not speak to me any more.

"How long was he without speaking to you?—Two months, and he was so cruel that he made a copy of the paragraphs of my sister's letter and some time after I came back to the house I found them pasted on the mirror and on my plates, copied in typewriting.

"What was your impression upon finding under the plates such pieces of paper copied in typewriting with the paragraphs of your sister's letter and on the mirrors as you have said?—It was a terrible suffering to me.

"How long did he do this?—He did it whenever I went out.

"For how long?—For several weeks.

"During that time was he in good relations with you?—None whatever. He sat at the table and did not speak to me; he cared nothing for me. I suffered so much in those days that I was compelled to call my brother-in-law, my sister's husband, so that he could come to see if he could arrange the difficulties.

"Those papers which you say he placed under the plates and on the mirrors, how did he do that, did he do it secretly, or in the presence of some other persons?—In the presence of the servants."

The studied, wilful and deliberate character of such con-
duct is at once apparent, and is enough to take the instant
controversy out of the class of cases in which it is held that
"mere austerity of temper, petulance of manners, rudeness
of language, or even occasional sallies of passion, if they do
not threaten bodily harm or impairment of health, do not as
a general rule amount to cruelty." 9 R. C. L., page 337,
section 116.

We concur in the findings made by the trial judge as
follows:

"The court, after examining the evidence, is of the opinion that
the essential facts of the complaint have been proved and that the
conduct of the defendant towards his wife constitutes the cruel treat-
ment referred to in section 164 of the Civil Code.

"Undoubtedly no other words can describe the conduct of a hus-
band who without a justified reason does not speak to his wife dur-
ing a period of two months, thus causing the neighbors and servants
in the house to become aware of the lack of harmony between the
parties, and who, whenever a relative of the wife writes her or comes
to the house, does not speak to her and abandons the house; and if
we further add to these facts that we think that it has been shown
that without any just cause and in the presence of the servants he
held his wife by the arms in a violent manner and threw her aside;
and if we find also as an established fact that the wife has never
enjoyed good health and that she belongs to a very good family,
which circumstances undoubtedly influence in a great degree her
peace of mind and happiness, we should agree with her that it is
impossible for her to live any longer with the defendant, and, there-
fore, we should and do hereby sustain the complaint and decree that
the marriage tie existing between Carmen Fernández and Dr. Lorenzo
Casalduc is dissolved. The children will remain under the *patria
potestas* of the mother and the defendant is adjudged to pay the
costs and attorney's fees."

As a qualification of the rule in regard to mere incom-
patibility of temperament as a ground of divorce, we find
in the volume and page last above mentioned, section 117,
the following:

"But though mere incompatibility of temperament is not itself ground for divorce, it is well recognized, especially in the modern cases, that the jury, or the court sitting as a trier of the facts, in determining whether the circumstances show cruelty should always keep in view the intelligence, apparent refinement, and delicacy of sentiment of the complaining party."

Again:

"The courts fully recognize that an entirely physical and sensual view of the marriage relation is not to be taken, but that such relation in its legal point of view also aims at the social happiness and mental enjoyment of those united in it. Consideration, therefore, is given to sullen and unsociable conduct on the part of the defending spouse in determining whether the latter has been guilty of cruelty. Still, it seems mere unsociability on the part of either spouse can not in itself be deemed cruelty, and in a case which seems to be more free of collateral facts than most cases it was held that a divorce would not be granted for cruelty because an outdoor laborer, working long hours every day, including Sundays, as a watchman at a railway crossing, when he reached home after his work preferred to read or go to bed rather than to talk to his wife or to take her out to entertainments or to visit friends. On the other hand, it has been held that evidence that husband and wife had lived in the same house and eaten at the same table food prepared by her, without his speaking to her except in anger, for three months at a time, was sufficient to establish cruel and inhuman treatment on his part and to justify the court in granting her a divorce." *Idem,* page 348, section 130.

Even in jurisdictions where danger to life is an essential element we find that:

"In the majority of cases the courts have held that a statutory provision specifying treatment endangering life as a ground for divorce does not require the use of physical violence but that conduct, violent or otherwise, which, under all the circumstances of the case, endangers life, is intended thereby." Note to *Thompson* v. *Thompson,* 5 A. S. R. 712.

And it has been said that "to impair health is to en-

danger life." *Cole* v. *Cole* (1867) 23 Iowa, 433, cited in note last mentioned.

See also the opinion in the reported case. (*Thompson* v. *Thompson.*)

The argument under the third assignment, without any showing of prejudice and without any very definite or intelligible theory or citation of authority in support of the proposition as stated, *supra,* drifts into an extended and desultory discussion of the evidence, which, as we have already intimated, is more than sufficient to sustain the findings of the court below.

The judgment appealed from must be

*Affirmed.*

Chief Justice Hernández and Justices Del Toro and Aldrey concurred.

Mr. Justice Wolf took no part in the decision of this case.